## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| JEREMY KEEL, JEROD BREIT, HOLLEE ELLIS, FRANCES HARVEY, RHONDA BURNETT, DON GIBSON, LAUREN CRISS, JOHN MEINERS, DANIEL UMPA, CHRISTOPHER MOEHRL, MICHAEL COLE, STEVE DARNELL, JACK RAMEY, and JANE RUH, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Case No. __ |
| HOUSE OF SEVEN GABLES REAL ESTATE, INC., WASHINGTON FINE PROPERTIES, LLC; SIDE, INC.; SIGNATURE PROPERTIES OF HUNTINGTON, LLC; J.P. PICCININI REAL ESTATE SERVICES, LLC; JPAR FRANCHISING, LLC; CAIRN REAL ESTATE HOLDINGS, LLC; CAIRN JPAR HOLDINGS, LLC; YOUR CASTLE REAL ESTATE, LLC; BROOKLYN NEW YORK MULTIPLE LISTING SERVICE, INC.; CENTRAL NEW YORK INFORMATION SERVICE, INC.; FIRST TEAM REAL ESTATE - ORANGE COUNTY | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     JURISDICTION AND VENUE ....................................................................... 9

III.    TRADE AND COMMERCE............................................................................. 10

IV.     THE PARTIES.................................................................................................... 11
        A.      Plaintiffs .................................................................................................. 11
        B.      Defendants ............................................................................................... 14
        C.      Co-Conspirators ...................................................................................... 16

V.      BACKGROUND OF THE REAL ESTATE INDUSTRY ............................. 16

VI.     THE ANTICOMPETITIVE AGREEMENT WITH NAR ............................. 19

VII.    NAR HAS REQUIRED LOCAL ASSOCIATIONS TO AGREE TO THESE
        ANTICOMPETITIVE RESTRAINTS ............................................................ 33

VIII.   CORPORATE DEFENDANTS PARTICIPATE IN, FACILITATE, AND
        IMPLEMENT THE CONSPIRACY ............................................................... 38

IX.     EFFECTS OF THE CONSPIRACY................................................................. 42

X.      MARKET POWER............................................................................................ 47

XI.     CONTINUOUS ACCRUAL ............................................................................ 49

XII.    CLASS ACTION ALLEGATIONS ................................................................. 49

XIII.   CLAIM FOR RELIEF ....................................................................................... 52

XIV.    REQUESTED RELIEF...................................................................................... 53

# I. INTRODUCTION

1. Plaintiffs, home sellers who listed homes on Multiple Listing Services in the United States ("the MLS"), bring this action against several large real estate brokerages (collectively, "Corporate Defendants") and two MLSs for agreeing, combining and conspiring to impose, implement, follow and enforce anticompetitive National Association of REALTORS® ("NAR") restraints that caused home sellers to pay inflated commissions on the sale of their homes, in violation of federal antitrust law. This unlawful conduct is also the subject of an active investigation by the Antitrust Division of the United States Department of Justice, which is examining practices in the residential real estate brokerage business, with a focus on compensation paid to brokers, as well as other conduct.

2. The Corporate Defendants and their co-conspirators collectively possess market power in local markets for real estate brokerage services through their control of the local MLSs. An MLS is a database of properties listed for sale in a particular geographic region and the marketplace on which the vast majority of homes in the United States are sold. Brokers must list a property for sale to effectively market that property to prospective buyers. The vast majority of MLSs are formally controlled by local NAR associations, and access to such MLSs is conditioned on brokers' agreement to follow all mandatory rules set forth in NAR's Handbook on Multiple Listing Policy, which until recently included the rules at issue here.

3. Pursuant to the conspiracy, and until recent pressure from litigation and an adverse jury verdict, NAR allowed brokers representing or otherwise working with home sellers and home buyers to use NAR's MLSs only if those brokers agreed to adhere to and implement terms that significantly restrained competition. Specifically, NAR and its co-conspirators required *every* listing broker (i.e., the broker representing the seller) when listing a property on a Multiple Listing

1

Service, to make a "*blanket unilateral offer[] of compensation*" to any broker who may have worked with a buyer in purchasing that property (the "buyer-broker"). This requirement, and related terms implementing the requirement, were, until recently, set forth in Policy Statement 7.23 in NAR's Handbook on Multiple Listing Policy. It is hereafter referred to as the "Buyer Broker Commission Rule" or "the Rule."

4.      Only a small number of MLSs are not exclusively owned or operated by NAR associations. These MLSs are nevertheless typically controlled by REALTOR® associations and/or NAR-aligned brokerages and are not fully independent from NAR. For example, Defendant Central New York Information Service ("CNYIS") located in New York State is managed by a local REALTOR® association, requires its members to adhere to NAR's Code of Ethics, and adopted NAR rules mandating blanket unilateral offers of compensation. While Defendant Brooklyn New York Multiple Listing Service ("Brooklyn MLS") has not adopted the Buyer Broker Commission Rule, in practice, it required listings to offer compensation to agents working with buyers.

5.      Moreover, all Realtors in the United States are subject to NAR rules. NAR issues a Code of Ethics, which applies nationwide and is binding on all REALTORS®, regardless of whether they operate in a NAR-affiliated MLS or an MLS not affiliated with NAR.

6.      Corporate Defendants' implementation of and adherence to this agreement, combination and conspiracy is manifestly anticompetitive:

- The Rule compelled the seller to make an offer of payment to compensate the buyer-broker even when the buyer-broker was working on behalf of the buyer, not the seller.

- It required that this be a blanket offer—i.e., the exact same compensation terms must be simultaneously offered to every buyer-broker without regard to their experience, the

services they provide to the buyer, or the financial arrangement they have made with the buyer.

- Because this blanket offer was required to be made available to every buyer-broker using the MLS (i.e., virtually all buyer-brokers) and could be compared by the buyer-broker with the blanket offers that every other seller must post on the MLS, *the Rule created tremendous pressure on sellers to offer a high commission that had long been maintained in this industry* so that buyer-brokers would not "steer" buyers away from their property and to properties offering higher buyer-broker commissions.

- The Rule *encouraged and facilitated anticompetitive "steering"* by buyer-brokers because it allowed them to compare the terms offered for buyer-broker compensation and steer their clients to properties where the seller was offering higher commissions. The prevalence of such steering, including its anticompetitive impact on consumers and exclusionary impact on brokers trying to compete with alternative, lower-cost models, is widely recognized in the economic literature. And the harm caused by actual steering was amplified by the perceived threat of steering: sellers were constrained to offer an inflated buyer-broker commission out of the fear that buyer-brokers would steer buyers away from their property.

- These effects were reinforced by the Rule's requirement that the offer of compensation be expressed as a percentage of the gross selling price of the home or a definite dollar amount and the Rule's prohibition on "general invitations by listing [i.e., seller] brokers to other participants to discuss terms and conditions of possible cooperative relationships."

- The anticompetitive effects were further reinforced by NAR's rules providing that after

the seller had received purchase offers, the listing broker was prohibited from attempting to unilaterally modify the buyer-broker commission that was offered on the MLS. NAR Standard of Practice 3-2, until recently, stated: "Any change in compensation offered for cooperative services must be communicated to the other REALTOR® prior to the time that REALTOR® submits an offer to purchase/lease the property. After a REALTOR® has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction." As a result, a seller could not respond to a purchase offer with a counteroffer that was conditional on reducing the buyer-broker commission. Nor could the seller, after receiving purchase offers, decide to unilaterally reduce or eliminate the buyer broker commission offered on the MLS.

- Until recently, the anticompetitive effects were compounded by the fact that NAR rules restricted consumers' visibility into the buyer-broker commissions that were being offered to their own brokers. This limited buyers' ability to know whether their brokers were only showing them properties where they would be paid the highest commission amounts. This obfuscation was made even worse by NAR's ethical rule, which was in place until 2022, that permitted buyer brokers to tell clients that their services were free.

7. There is no pro-competitive justification for this agreement and, to the contrary, the agreement's purpose and effect is to restrain competition. As one industry participant has acknowledged, "[i]t does not make sense for listing brokers to pay buyers' brokers for the services the latter provide to buyers. This is a bit like the lawyers working for one side in a transaction

4

paying the lawyers working for the other side."[1] Stephen Brobeck, the Executive Director of the Consumer Federation of America has testified that "[i]n a rational price system, home sellers and buyers would each pay for real estate brokerage services they receive."[2] "The simple fact is that, for decades, the dominant real estate firms and their trade association have tried, with much success, to maintain high, uniform prices within different geographic areas."[3]

8.      Each of the Corporate Defendants plays an active role in NAR and local realtor associations and has mandated and/or encouraged subsidiaries, franchisees, brokerages, and individual realtors to join and implement this anticompetitive scheme in order to secure the benefit of each Corporate Defendant's brand, brokerage infrastructure, and other support. The unlawful restraints implemented and enforced by the conspirators benefit NAR and the Corporate Defendants and further their common goals by allowing brokers to impose supra-competitive charges on home sellers and restrain competition by forestalling competition from lower-priced alternatives.

9.      Corporate Defendants use their franchise agreements, employee policy and procedures manuals, and leadership roles in NAR and local realtor associations, to require brokers in local residential real estate markets to adhere to NAR's rules, including the Buyer Broker Commission Rule, and thereby help implement and enforce the conspiracy.

10.      By participating in an association that prevents member institutions from allowing its employees and realtors to compete with each other to offer lower commissions, requiring franchisees, groups and individuals to join and adhere to the anticompetitive agreement alleged

---

[1] Brian N. Larson, *The End of MLS as We Know It*, INMAN (Aug. 15, 2006), https://www.inman.com/2006/08/15/end-mls-we-know-it/.

[2] Stephen Brobeck, *Residential Real Estate Brokerage Services: A Cockamamie System That Restricts Competition and Consumer Choice*, CONSUMER FEDERATION OF AMERICA, 4 (2006), http://archives-financialservices.house.gov/media/pdf/072506sb.pdf.

[3] *Id.*

herein, and taking numerous steps in furtherance of the conspiracy, the Corporate Defendants have agreed to participate in, facilitate, follow, implement and enforce the conspiracy.

11. The conspiracy saddled home sellers with costs that would either not exist or often be borne by buyers in a competitive market. Moreover, because most buyer-brokers would not show homes to their clients where the seller was offering a lower buyer-broker commission, or would show homes with higher commission offers first, sellers were incentivized when making required blanket offers to procure the buyer-brokers' cooperation by offering high commissions. Thus, the conspiracy: (a) required sellers to pay overcharges for services provided by buyer-brokers; (b) raised, fixed and maintained buyer-broker compensation at levels that would not exist in a competitive marketplace; and (c) encouraged and facilitated steering and other actions that impede entry and market success by lower-cost real estate brokerage services.

12. This method of setting buyer-broker commissions is wholly different from the practices that would exist absent the Buyer Broker Commission Rule. Absent the Rule, buyers would have the incentive to set and negotiate buyer-broker pricing (where such brokers are used at all), and buyer-brokers would compete to be retained by offering lower commissions to their prospective clients for their services. The Buyer Broker Commission Rule restrained price competition among buyer-brokers because the clients retaining the buyer-broker, i.e., home buyers, had little incentive or ability to reduce their broker's commission because they were not paying the commission.

13. In more competitive but otherwise comparable foreign markets, homebuyers pay their brokers if they choose to use one, and they pay less than half the rate paid to buyer-brokers in the United States. In comparable international markets without a rule like the Buyer Broker Commission Rule, such as Australia, the United Kingdom, and the Netherlands, buyer-brokers, when they are used, are paid directly by home buyers, rather than by home sellers. As an article in

the *Wall Street Journal* explained, real estate brokers have "shielded themselves with a skein of anticompetitive practices" that "have kept the high fees they charge unchanged since 1991."[4] The total broker fees that have been imposed are "significantly higher than those paid elsewhere in the developed world," and, if they were instead paid at a competitive level, American consumers would save tens of billions of dollars annually.[5]

14. Defendants' conspiracy has maintained broker commission levels at remarkably stable and inflated levels for the past two decades, despite the advent of the Internet and the diminishing role of buyer-brokers. According to the Consumer Federation of America, in the United States, the average total commission rates continue to remain between 5% and 6%, which is "no lower than it was in 2001" despite significant technological advances.[6] Approximately one half or more of this amount is the commission for the buyer-broker.

15. Moreover, because housing prices have increased substantially during this period (at a rate significantly exceeding inflation), and commissions are charged based on a percentage of a home's sale price, the actual dollar commissions imposed on home sellers increased significantly because housing prices were much higher. For example, between 2001 and 2022 the average price of new homes in current dollars sold rose from $213,200 to $540,000, according to U.S. Census Bureau Statistics.[7] As the Consumer Federation of America has observed, "[b]ecause the industry functions as a cartel, it is able to overcharge consumers tens of billions of dollars a

---

[4] Jack Ryan & Jonathan Friedland, *When You Buy or Sell a Home, Realty Bites*, WALL ST. J. (Mar. 3, 2019), https://www.wsj.com/articles/when-you-buy-or-sell-a-home- realty-bites-11551649734.

[5] *Id.*

[6] FTC-DOJ Joint Public Workshop, Segment 3 Tr. June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokeragecompetition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_ segment_3.pdf; https://www.realtrends.com/articles/average-real-estate-commission-rate-at-highest-level-since-2013/ ("Average real estate commission rate at highest level since 2013").

[7] *New Residential Sales: Historical Data*, U.S. CENSUS BUREAU, https://www.census.gov/construction/nrs/historical_data/index.html (last visited Dec. 22, 2023).

year. . . . Consumers are increasingly wondering why they are often charged more to sell a home than to purchase a new car."[8]

16.     Indeed, Defendants have successfully stabilized buyer-broker commissions (and significantly increased the dollar cost) charged despite the diminishing role of buyer-brokers. According to data from NAR, most homebuyers no longer locate prospective homes with the assistance of a broker, but rather independently through online services. Buyer-brokers increasingly have been retained after their client has already found the home the client wishes to buy. Despite their diminishing role, buyer-brokers have continued to receive the same artificially elevated percentage of the sales price due to Defendants' conspiracy. Defendants' success in maintaining (and, in inflation-adjusted dollar terms, substantially increasing) the charge imposed by buyer-brokers despite the advent of new technologies stands in stark contrast to other industries. "[I]n almost every other consumer industry -- booksellers, retailers, home appliances, insurance, banking, stockbrokers -- the introduction of Internet and discount sellers has been a phenomenal financial benefit to customers. Discount airlines have cut airfares by 60% or more, to the economic benefit of everyone with the exception of the incumbent competitors. . . . Economists call this process of squeezing out transaction costs 'disintermediation.' If any industry is ripe for this, it is the $70 billion-a-year real estate brokerage market."[9] Instead, "[e]ven as housing prices have changed over time and technological advances have arguably made the broker's job *easier*, commission rates in the industry have remained remarkably steady at around five to six percent."[10]

17.     The conspiracy's effect can also be seen in the disconnect between buyer-broker

[8]     Glen Justice, *Lobbying to Sell Your House*, N.Y. TIMES (Jan. 12, 2006), https://www.nytimes.com/2006/01/12/business/lobbying-to-sell-your-house.html.
[9] *The Realtor Racket*, WALL ST. J. (Aug. 12, 2005), https://www.wsj.com/articles/SB112381069428011613.
[10] Beth Nagalski, *Ending the Uniformity of Residential Real Estate Brokerage Services: Analyzing the National Association of Realtors' Multiple Listing Service Under the Sherman Act*, 73 BROOKLYN L. REV. 771, 781-82 (2008).

costs and commissions. Buyer-broker costs are similar regardless of the price of the home, yet due to the anticompetitive restraints buyer-brokers are paid, for example, four times more when their client buys a million-dollar home rather than a $250,000 home. As the *Wall Street Journal* has explained, "many, if not most, of the services that Realtors provide don't vary with the sales price, so the percentage fee should fall as home price rises."[11] Instead, the commissions imposed on home sellers are "unrelated to either the quantity or quality of the service rendered or even to the value provided."[12]

18.     The conspiracy has inflated buyer-broker commissions, which, in turn, have inflated the total commissions paid by home sellers such as Plaintiffs and the other class members. Plaintiffs and the other class members have each incurred, on average, thousands of dollars in overcharges as a result of Defendants' conspiracy. In a competitive market, buyers would have the incentive to set and negotiate buyer-broker prices, and the total commissions paid in any transaction, including the commissions paid by sellers would be lower.

19.     Plaintiffs, on behalf of themselves and the class, sue for Defendants' violations of the federal antitrust laws as alleged herein, and seek treble damages, injunctive relief, and the costs of this lawsuit, including reasonable attorneys' fees, and demand a trial by jury.

## II.     JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction under 28 U.S.C. §1332(d)(2), because the classes contain more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of each class is a citizen of a State different from Defendants. The Court also has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 4, 16 and 28 U.S.C.

---

[11] The Realtor Racket, *supra* note 12.
[12] Mark S. Nadel, *A Critical Assessment of the Traditional Residential Real Estate Broker Commission Rate Structure*, 5 CORNELL REAL ESTATE R. 1, 1 (2007).

§§ 1331, 1337.

21.      This Court has personal jurisdiction over Defendants, each of which has been properly served. As set forth in more detail below, Defendants have (1) transacted substantial business in the United States, including in this District; (2) transacted business with members of the Class throughout the United States, including in this District; (3) had substantial contacts with the United States, including in this District; (4) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District; and/or (5) have consented to venue in this District for purposes of settlement approval only.

22.      Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. §1391(b), (c), and (d). Certain Defendants have transacted business, have been found, had agents in and/or resided in this District; a substantial part of the events giving rise to the claims of Plaintiffs and the class arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## III.      TRADE AND COMMERCE

23.      The Buyer Broker Commission Rule and other anticompetitive NAR rules applied and have been implemented and enforced by Defendants and co-conspirators nationwide. These rules governed the conduct of local NAR associations, local brokers, and local realtors nationwide. Defendants' conduct alleged herein has inflated buyer-broker commissions nationwide, and has injured home sellers in those areas and nationwide. Corporate Defendants, through their subsidiaries, franchisees, brokers and other co-conspirators, and Defendant MLSs are engaged in interstate commerce, and are engaged in activities affecting interstate commerce, in the United States.

## IV.    THE PARTIES

### A.    Plaintiffs

24.    Jeremy Keel is a citizen of Missouri and resident of Kansas City, Missouri. On or about September 28, 2020, Mr. Keel sold a home located in the Kansas City metropolitan area. The home was listed on the Heartland MLS. In that sales transaction, Mr. Keel was represented by a Keller Williams-affiliated broker. As part of the sales transaction, Mr. Keel paid a substantial buyer-broker commission, with a total commission of 6%, of which 3% was paid to the buyer's broker.

25.    Jerod Breit is a citizen of Indiana and a resident of Indianapolis, Indiana. On or about March 1, 2017, Mr. Breit sold a home located in the St. Louis metropolitan area. The home was listed on the MARIS MLS. Mr. Breit was represented by a RE/MAX-affiliated broker. As part of the transaction, Mr. Breit paid a substantial buyer-broker commission, with a total broker commission of 6%, of which 2.7% was paid to the buyer's broker.

26.    Hollee Ellis is a citizen of Missouri and a resident of Ozark, Missouri. On or about December 30, 2016, Ms. Ellis sold a home located in the Ash Grove, Missouri area. The home was listed on the Southern Missouri Regional MLS. Ms. Ellis was represented by Coldwell Banker – a Realogy broker. As part of the sales transaction, Ms. Ellis paid a substantial buyer broker commission, with a total broker commission of 6%, of which 3% was paid to the buyer's broker.

27.    Frances Harvey is a citizen of Missouri and a resident of Columbia, Missouri. On or about August 21, 2020, Ms. Harvey sold a home located in Columbia, Missouri. The home was listed on the Columbia Board of Realtors MLS. Ms. Harvey was represented by a RE/MAX broker. As part of the sales transaction, Ms. Harvey paid a substantial buyer broker commission, with a total broker commission of 6%, of which 3% was paid to the buyer's broker.

28.     Rhonda Burnett is a citizen of Missouri and resident of Kansas City, Missouri. On January 26, 2016, she sold a home located in the Kansas City metropolitan area. The home was listed on the Heartland MLS. In that sales transaction, Burnett was represented by a ReeceNichols-affiliated realtor, and the buyer was represented by a Re/Max affiliated broker. As a part of the sales transaction, Burnett paid a substantial buyer-broker commission, with a total broker commission of 6%, of which 3% was paid to the buyer's broker.

29.     At the time of his home sale, Don Gibson was a resident and citizen of Missouri; currently he is a resident and citizen of Florida. Gibson sold his home located in Columbia, Missouri in June 2021. Gibson used Weichert Realtors—First Tier as his listing broker to sell the home; Gibson's home was listed on the Columbia Board of Realtors MLS serving the mid-Missouri area. Upon closing his home sale, Gibson paid $15,750 (3% of the purchase price) to the buyer's broker affiliated with House of Brokers Realty, Inc.

30.     Lauren Criss is a resident and citizen of Missouri. She sold her home located in Kansas City, Missouri in September 2023. Criss used Defendant Compass Realty Group as her listing broker to sell the home; Criss's home was listed on the Heartland MLS serving the Kansas City area. Upon closing her home sale, Criss paid $7,380 (3% of the purchase price) to the buyer's broker affiliated with Keller Williams Realty Partners, Inc.

31.     At the time of his home sale, John Meiners was a resident and citizen of Missouri; currently he is a resident and citizen of Kansas. Meiners sold his home located in Kansas City, Missouri in August 2023. Meiners used Compass Realty Group as his listing broker to sell the home; Meiners' home was listed on the Heartland MLS serving the Kansas City area. Upon closing his home sale, Meiners paid $15,360 (3% of the purchase price) to the buyer's broker affiliated with Platinum Realty.

32.     Daniel Umpa is a resident of Davidsonville, Maryland. On June 30, 2021, he sold a home located in Canal Winchester, Ohio, which was listed on the Columbus Board of Realtors MLS. Mr. Umpa was represented by Redfin. As part of that sales transaction, Mr. Umpa paid a substantial buyer-broker compensation. On November 30, 2023, Mr. Umpa sold a home in Edgewater, Maryland, which was listed on the Bright MLS. He was represented in that sales transaction by Compass, Inc. As part of that transaction, he paid a substantial buyer-broker compensation.

33.     Christopher Moehrl is a resident of Shorewood, Minnesota. On November 15, 2017, he sold a home located in the Minneapolis metropolitan area. The home was listed on the Northstar MLS. In that sales transaction, Mr. Moehrl was represented by a RE/MAX franchisee, and the buyer was represented by a Keller Williams franchisee. As part of the sales transaction, Mr. Moehrl paid a substantial buyer-broker commission.

34.     Michael Cole is a resident of Parker, Colorado. On May 18, 2017, he sold a home located in the Denver metropolitan area. The home was listed on the REColorado MLS. In that sales transaction, Mr. Cole was represented by RE/MAX and the buyer was represented by All Pro Realty of Denver. As part of the sales transaction, Mr. Cole paid a substantial buyer-broker commission.

35.     Steve Darnell is a resident of Park, Texas. On June 1, 2016, he sold a home located in the Austin metropolitan area. The home was listed on the Central Texas Realty Information Services MLS. In that sales transaction, Mr. Darnell was represented by a Coldwell Banker United realtor. As part of the sales transaction, Mr. Darnell paid a substantial buyer-broker commission.

36.     Jack Ramey is a resident of Martinsburg, West Virginia. On May 8, 2015, he sold a home located in the Baltimore metropolitan area. The home was listed on the Bright MLS. In

that sales transaction, Mr. Ramey was represented by a Century 21 franchisee, and the buyer was represented by a different agent. As part of the sales transaction, Mr. Ramey paid a substantial buyer-broker commission.

37.     Jane Ruh is a resident of Caledonia, Wisconsin. On September 26, 2018, she sold a home located in the Milwaukee metropolitan area. The home was listed on Metro MLS. In that sales transaction, Ms. Rus was represented by a RE/MAX franchisee, and the buyer was represented by a different broker. As part of the sales transaction, Ms. Ruh paid a substantial buyer-broker commission.

**B.     Defendants**

38.     Each Defendant has a presence in the nationwide market.

39.     Washington Fine Properties, LLC (hereinafter "Washington Fine Properties") is the premier residential real estate brokerage in the Washington, DC region. It is incorporated in Delaware and headquartered in Washington, DC. Washington Fine Properties is ranked among the top brokerages. In 2024, WFP reported average sales volume per agent of $13.8 million and total sales volume for the year of $2.5 billion.

40.     House of Seven Gables Real Estate, Inc. (hereinafter "Seven Gables") is a large, independent real estate brokerage incorporated and headquartered in California. It has been the leading brokerage in Orange County, California for forty-seven years. According to T360, Seven Gables' 2022 sales volume was $2,180,000.

41.     Side, Inc. (hereinafter "Side") is a top real estate brokerage platform that works with real estate agents and brokers to create and grow their own real estate brokerages. Side has worked with agents and brokers to create over 500 real estate companies in 17 states and Washington, D.C. Side is headquartered in California and incorporated in Delaware.

42.     Signature Properties of Huntington LLC d/b/a Signature Premier Properties (hereinafter "Signature Premier Properties") is the fastest growing real estate company in Long Island, New York with a closed sales volume of $3.3 billion.[13] Signature Premier Properties is headquartered and incorporated in New York.

43.     J.P. Piccinini Real Estate Services, LLC a/k/a JPAR Real Estate Services, LLC (hereinafter "JPAR Real Estate") is a top real estate brokerage with over 3,500 agents across the country and operating in more than 30 states, including a new location in Columbia, Missouri. JPAR Real Estate is headquartered and incorporated in Texas. The affiliated company, JPAR Franchising, LLC, is the franchisor for JPAR Real Estate, and is incorporated and headquartered in Texas.

44.     Cairn Real Estate Holdings, LLC and Cairn JPAR Holdings, LLC are the parent corporations of JPAR Real Estate. Cairn Real Estate Holdings is headquartered in Salt Lake City, Utah and incorporated in Delaware. Cairn JPAR Holdings, LLC is incorporated in Delaware. Cairn Real Estate Holdings' portfolio of companies also includes Your Castle Real Estate, LLC, which is the largest independent real estate brokerage in Colorado and is headquartered and incorporated in Colorado.

45.     Central New York Information Service, Inc. (hereinafter "CNYIS") is a non-REALTOR® MLS that is REALTOR® broker owned and managed by a local REALTOR® association. CNYIS is headquartered and incorporated in New York.

46.     Brooklyn New York Multiple Listing Service, Inc. (hereinafter "Brooklyn MLS") is a non- REALTOR® MLS headquartered and incorporated in New York.

47.     First Team Real Estate – Orange County (hereinafter "First Team") is the largest

---

[13] https://www.signaturepremier.com/

privately held family owned real estate agency in Southern California with more than 30 offices and 2,000 agents. First Team is headquartered and incorporated in California.

### C.  Co-Conspirators

48.  NAR, multiple local realtor associations, other brokerages, and MLSs not named as Defendants participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.

49.  By adopting the Buyer Broker Compensation Rule, NAR, other brokers, and MLSs, among others, have participated as co-conspirators in the antitrust violations alleged herein and performed acts and made statements in furtherance thereof.

50.  Multiple franchisees and brokers of the Corporate Defendants participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.

51.  Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as defendants in this Complaint.

## V.  BACKGROUND OF THE REAL ESTATE INDUSTRY

52.  State licensing laws regulate who can represent sellers and buyers in the real estate market. There are typically two licensee categories: (1) the real estate broker; and (2) the individual real estate licensee or agent.

53.  Licensed brokers are typically the only ones permitted by law to be paid to represent buyers or sellers in a real estate transaction. For that reason, real estate brokerage contracts with sellers and buyers are typically required to be with brokers, not agents, and all payments to individual agents must pass through brokers.

54.  According to NAR, 86% of sellers sold their home with the assistance of a real

estate broker in 2022, and 86% of buyers purchased their home with the assistance of a real estate broker in 2022.

55.     The standard practice in the residential real estate industry has been to compensate brokers and agents with commissions that are calculated as a percentage of a home's sale price. Commissions are paid when the home sells.

56.     Most brokers and their individual agents occupy dual roles: they operate as listing brokers for some home sales and as buyer-brokers for other home sales.

57.     A listing broker's compensation was specified in a listing agreement, a contract between the seller and the listing broker that details the terms of the listing. A listing agreement typically states that the listing broker has the exclusive right to market the seller's home. The listing agreement previously specified the total commission that a home seller would pay to the listing broker, often with a portion of that amount earmarked to be paid to the buyer-broker in the event the buyer had a broker (and the seller may have retained that overcharge even if a buyer-broker was not used or the buyer-broker attempted to negotiate a different fee for the buyer-broker's services).

58.     If the buyer had a broker, the seller or the listing broker (as the seller's agent) paid the buyer-broker a commission out of the total commission paid by the seller. In other words, buyer-brokers—who assisted their clients in negotiating against the seller—received their compensation from the total commission paid by the seller, not from the buyer they represented. In fact, until 2022, a standard of conduct in NAR's Code of Ethics permitted and encouraged buyer-brokers to tell their clients that their services were free.

59.     In the past, in the listing agreement, the seller set the total commission that was paid to the listing broker with the expectation that a portion of the commission waspaid to a buyer-

broker. If, as would happen in the absence of the Buyer Broker Commission Rule, buyers were incentivized to negotiate and set the compensation of their brokers, (i) sellers would typically agree in their listing agreements to pay a commission solely to compensate the listing broker because sellers have no incentive to compensate a buyer-broker negotiating against their interests, and (ii) the listing broker commission would be about half or less of the amount that sellers have paid as a total commission to compensate both the buyer-broker and the listing broker.

60.     In the past, when a buyer retained a broker, the buyer sometimes entered into a written contract with that broker. The contract typically disclosed that the buyer-broker was compensated by receiving a commission from the listing broker.

61.     An MLS is a database of properties listed for sale in a defined region that is accessible to real estate brokers and their individual realtors that agree to comply with the rules of the MLS. The vast majority of MLSs are owned and operated by local realtor associations that are affiliated with, and governed by, NAR. Listing brokers list their client's property on an MLS as required by a NAR rule, and to ensure that buyer-brokers and prospective buyers are aware of the property. If a listing broker does not list a client's property on an MLS, most buyer-brokers will not show that property to prospective buyers. MLSs also act as the main source of listings for online websites, such as Zillow, through which many prospective homebuyers find homes. A home that is not listed on an MLS is very hard to find for prospective homebuyers.

62.     The Buyer Broker Commission Rule obligated a listing broker, on behalf of the seller, to make blanket, unilateral offers of compensation to buyer-brokers when listing a home on an MLS owned by a local realtor association. If a buyer represented by a broker purchased the home, the buyer-broker received the offered compensation.

63.     The following example illustrate how this process typically worked:

- A homeowner entered into a contract with a listing broker, in which the seller agreed to pay the listing broker six percent in total commissions in exchange for marketing and facilitating the sale of the home.

- The listing broker then made a blanket, unilateral offer of a three percent commission to every buyer-broker when it listed the home on the local MLS.

- A buyer-broker showed the property to a buyer client, who bought the home for $500,000.

- The seller then paid six percent of the sales price ($30,000): 3% to the listing (seller) broker and 3% to the buyer broker.

## VI.    THE ANTICOMPETITIVE AGREEMENT WITH NAR

64.     Prior to adoption of the Buyer Broker Commission Rule in 1992 (and its revision in 1996), NAR played the central role in implementing and enforcing, through the MLS system, a market structure in which *all* brokers involved in residential home sales represented the seller either as the seller's broker or the "sub-agent" of the seller's broker. Under this "almost universal sub agency system . . . brokers, even those working solely with buyers, were legally obligated to represent the interests of sellers."[14] Because "nearly all brokers involved in transactions represented the seller either as the seller's agent or as the subagent of the listing [i.e., seller's] broker," the seller's broker got paid by the seller and would then compensate the subagent working with the buyer.[15] In fact, "[a]s a rule, MLS's required that offers of compensation be contingent on the cooperating broker acting as a subagent of the listing broker, rather than an agent of the buyer. Subagency allowed cooperating brokers who worked with buyers to collect a share of the

[14] Stephen Brobeck & Patrick Woodall, *How the Real Estate Cartel Harms Consumers and How Consumers Can Protect Themselves*, CONSUMER FED'N OF AM., 3 (2006), https://consumerfed.org/pdfs/Real_Estate_Cartel_Study061906.pdf.
[15] Larson, *supra* note 3.

commissions paid by sellers without actually representing buyers in an agency capacity."[16]

65.     Under the sub-agency system, homebuyers commonly proceeded on the mistaken understanding that the subagent broker was working on the buyer's behalf (even though the broker instead owed a fiduciary obligation to *the seller*). "When this sub agency system, in which brokers working with buyers were legally obligated to pass on information disadvantageous to their clients to sellers, was exposed through press coverage, it collapsed almost overnight."[17]

66.     With the emergence of brokers who were no longer sub-agents of the seller's broker, but were instead working for the buyer, there was no justification for requiring the seller to pay this cost. As one industry participant acknowledged, "[w]ith the demise of subagency, there is little reason to keep interbroker compensation. . . . It does not make sense for listing brokers to pay buyers' brokers for the services the latter provides to buyers."[18]

67.     Instead of adjusting to this fundamental change in the market—and, in particular, the fact that the buyer's broker was now often working for the buyer—the Defendants have followed and enforced a scheme designed to maintain supra-competitive commissions and impede lower-priced competition.[19] In 1992, NAR adopted the Buyer Broker Commission Rule as part of

---

[16]   Matt Carter, *From Subagency to Non-Agency: A History*, INMAN (Feb. 17, 2012), https://www.inman.com/2012/02/17/from-subagency-non-agency-a-history/; *See* Ann Morales Olazabal, *Redefining Realtor Relationships and Responsibilities: The Failure of State Regulatory Responses*, 40 Harv. J. on Legis. 65, 71 (2003) (explaining that for years, the "dominant real estate exchanges"—i.e., the MLS's—permitted cooperating or selling agents (those working with buyers) to split the commission to be paid by the seller only if the cooperating agent agreed to be a subagent of the seller").

[17]   Brobeck & Woodall, *supra* note 28.

[18]   Larson, *supra* note 3.

[19]   The NAR, local Realtor boards, and MLSs have a long history of anticompetitive actions designed to maintain broker commissions and impede entry by lower-cost alternatives. NAR's predecessor, the National Association of Real Estate Exchanges "institutionalized a commission rate norm when it adopted its first Code of Ethics in 1913. It stated that 'an agent should always exact the regular real estate commission prescribed by the board or exchange of which he is a member.'" P. Barwick, P. Parag, A. Pathak & M. Wong, *Conflicts of Interest and the Realtor Commission Puzzle*, NAT'L BUREAU OF ECON. RESEARCH, 4 (2015), https://www.nber.org/papers/w21489.pdf. In 1950, NAR's Code of Ethics stated that "every Realtor . . . should maintain the standard rates of commission adopted by the board and no business should be solicited at lower rates." After a 1950 Supreme Court decision found brokers guilty of price-fixing in violation of the Sherman Act, *United States v. Nat'l Assn. of Realtors,* 339 U.S. 485, 488, 494-95 (1950), local Realtor associations continued to fix prices "for the next twenty-eight years" by recommending or

its Handbook on Multiple Listing Policies.

68. The NAR Board of Directors, and the Multiple Listing Issues and Policies Committee reporting to it, periodically determine whether to modify any policies in the Handbook on Multiple Listing Policy. The policies that are retained (and any modifications thereto) are set forth in new editions of the Handbook on Multiple Listing Policy that are issued on or about an annual basis. The Board of Directors, and the Handbook on Multiple Listing Policy, consistently and repeatedly retained the Buyer Broker Commission Rule.

69. For decades, and until recent pressure from litigation and an adverse jury verdict, NAR, the Corporate Defendants, and other co-conspirators wrote, reupped, and imposed the Buyer Broker Commission Rule nationwide.

70. In setting forth the MLS terms, NAR successfully invited the Corporate Defendants and other co-conspirators to participate in the following agreement, combination and conspiracy: They could participate in the MLS, and gain the benefits provided by NAR and the MLS, but only if they agreed to follow and enforced the anticompetitive restraints set forth in the Handbook on Multiple Listing Policy.

71. NAR's Handbook on Multiple Listing Policy provides that "Association and Association-owned MLSs must conform their governing documents to the mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as

---

suggesting commission rate schedules or establishing minimum prices. David Barry, *Nine Pillars of the Citadel*, Report Submitted to the FTC/DOJ Workshop on Competition Policy and the Real Estate Industry, 26-27 (2005), https://www.justice.gov/sites/default/files/atr/legacy/2005/12/05/213351.pdf. Since that time, NAR, its affiliates, and other MLSs continued to implement illegal policies designed to restrain competition. *See, e.g.*, *United States v. Realty Multi-List, Inc*., 629 F.2d 1351 (5th Cir. 1980) (holding that MLS was enforcing unreasonable membership criteria restricting access to MLS); *Thompson v. Metropolitan Multi-List, Inc*., 934 F.2d 1566 (11th Cir. 1991) (finding MLS requirement restricting access anticompetitive and unlawful); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003) (finding MLS fee for access anticompetitive and unlawful); *In the Matter of MiRealSource, Inc.*, No. 9321 (F.T.C. 2007) (Consent Order regarding MLS rules limiting alternative business models); *United States v. Nat'l Ass'n of Realtors*, No. 05 C 5140, 2006 WL 3434263 (N.D. Ill. Nov. 27, 2006) (Consent Decree forbidding policies adopted by NAR imposing restraints on Virtual Office Websites).

members boards and to ensure coverage under the master professional liability insurance program."

72.     The Handbook, until recently, stated the Buyer Broker Commission Rule as follows: "In filing a property with the multiple listing service of an association of REALTORS®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants." The Handbook further stated that "multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."

73.     The Buyer Broker Commission Rule shifted a cost to the seller that would be negotiated and set by the buyer in a competitive market. As the Consumer Federation of America has explained, "[i]n a rational pricing system, home sellers and buyers would each pay for real estate brokerage services they receive."[20] The Rule, however, imposed a financial overcharge on home sellers by requiring them to make a "blanket unilateral offer of compensation" to the buyer-broker as a condition of participating on the MLS.[21] As a result of the Rule, listing brokers were required to make "blanket, unilateral, unconditional offers of compensation to their adversarial buyer brokers. Every MLS in the U.S. required that listing brokers offer compensation to buyer brokers."[22]

74.     There is no pro-competitive justification for imposing this overcharge on home

---

[20] Brobeck, *supra* note 4, at 4.
[21] *Id.* at 3.
[22] Douglas R. Miller, *Letter to DOJ/FTC*, CONSUMER ADVOCATES IN AMERICAN REAL ESTATE (CAARE), 5 (2018), https://www.ftc.gov/system/files/documents/public_comments/2018/07/00052- 147606.pdf.

sellers. As one commentator has written: the practice of "sellers' brokers specifying the fees that buyers' brokers charge to the latter's own clients, should be recognized" as "at least an attempt to fix market prices. . . . There is no longer any reason to permit listing brokers to set the default prices that these competing buyers' brokers charge to serve their own customers. . . . The elimination of interbroker compensation would diminish the ability of traditional brokers to frustrate vigorous price competition, and thus likely lead to a dramatic fall in broker revenues."[23]

75.     Further, by requiring that this be a "blanket" offer, the Rule compelled home sellers to make this financial offer without regard to the experience of the buyer-broker or the services or value they were providing. The same fee had to be offered to a new buyer-broker with little or no experience, as that offered to a buyer-broker with many years of experience. As a result, there is a significant level of uniformity in the payments that sellers paid to buyer-brokers. "One implication of fairly uniform rates is that there is little or no relationship between commission level and service quality. Skilled, experienced agents and brokers charge about the same price as agents with little experience and limited knowledge of how to best serve the consumer clients. In a price-competitive market, less experienced and less skilled agents would be offering consumers lower commission rates, but we know of no compelling evidence that they are doing so."[24]

76.     Because the blanket offer had to be made available to every buyer-broker using the MLS (i.e., virtually all buyer-brokers), and could be compared to the blanket offers that every other listing broker must post to participate on the MLS, the Rule was designed to create tremendous

---

[23] Nadel, *supra* note 15, at 64-65. *See also* B. Kaufman, *Why the Class Action Lawsuit Against NAR and the Big Brokers Makes Sense* (June 3, 2019), https://www.inman.com/2019/06/03/why-the-class-action-lawsuit-against-nar-and-the-big-brokers-makes sense/ (article by real estate broker explaining that the buyer- broker commission has been "locked in" at 2.5 – 3 percent).

[24] Brobeck, Comments of Stephen Brobeck, Executive Director Consumer Federation of America Before the Department of Justice-Federal Trade Commission Public Workshop on Competition Issues, CONSUMER FEDERATION OF AMERICA, 3 (2018), https://consumerfed.org/wp-content/uploads/2018/06/CFA-comments-DOJ-FTC- public-workshop-on-competition-issues.pdf.

pressure on sellers to offer the high, standard commission that had long been maintained in this industry. Listing brokers knew that if the published, blanket offer was less than the standard commission, many buyer-brokers would "steer" homebuyers to the residential properties that provided the higher standard commission. As discussed in more detail below, the prevalence of such steering has been widely reported in government reports, economic research and the trade press and is well understood by the Corporate Defendants and their co-conspirators.

77.     The entirely foreseeable result of the Buyer Broker Commission Rule is that the "blanket" offers of compensation to buyer-brokers are overwhelmingly made at or near the high level that prevails in the industry and Defendants are acting to sustain. The Consumer Federation of America has explained, "Typically, on either a 5% or 6% commission, 3% will be offered to brokers with buyer clients, and that commission split is disclosed to brokers on real estate firm and multiple listing service databases." The listing of the 3% split "then acts as a powerful force to discourage lower splits of 2% or even 1% because listing brokers, and their sellers, fear that properties carrying these lower splits will not be shown. As a result, "a listing broker lists a split below" the standard industry level "at their, and their clients', peril because of the risk that traditional brokers working with buyers will avoid this property. . . . This informal discrimination against price competitors is the most important factor that allows dominant brokers to maintain high and uniform prices."[25]

78.     The Buyer Broker Commission Rule facilitated anticompetitive steering away from brokers who deviate significantly from "the standard real estate commission" by enabling buyer-brokers to identify and compare the buyer-broker compensation offered by every seller in the MLS and then steer clients to homes offering higher commissions. As one commentator has explained:

---

[25] Brobeck, *supra* note 4, at 3-4.

"[t]he effects of steering, and its efficiency in curtailing price competition because of the importance of cooperating in the residential real estate industry, have been widely discussed. Brokers are able to engage in steering because 'an MLS listing gives brokers information on the commission that will be paid to the broker who brings the buyer to that property.'"[26]

79. By encouraging and facilitating steering, the Buyer Broker Commission Rule deterred downward departures from the standard commission and enabled brokers to avoid doing business with or otherwise retaliate against buyer-brokers who tried to compete by offering significant discounts. One discounter explained in an FTC/DOJ workshop that after it offered a lower commission on the MLS, "[w]e've had bricks thrown through car windows. We've had our cars egged. We've had hate mail sent to our sellers." The discounter estimated that "40% of agents will go out of their way, above and beyond, and push hard not to show or sell your home if you don't offer a 2.8% or 3% commission."[27] As another commentator has explained: "Essentially, the MLS listing acts *as a tool which competing brokers can use to help enforce a near-uniform commission rate and drive out discounters.*"[28]

80. The United States Department of Justice's (DOJ) Antitrust Division is actively "investigating potentially anti-competitive practices in the residential real estate brokerage business, with a focus on compensation to brokers and restrictions on their access to listings."[29]

[26] Bradford W. Muller*, Encouraging Price Competition Among New Jersey's Residential Real Estate Brokers*, 39 SETON HALL L. REV. 665, 682-683, 683 n.100 (2009). *See also* Barwick, Pathak & Wong, *supra* note 33, at 1 ("In the conventional compensation arrangement where sellers pay for the commissions of their listing agents and potential buyers' agents, the latter have an incentive to prioritize properties that offer higher commissions. This kind of steering is thought to lead to uniformly high commissions.").

[27] Statement of Joshua Hunt, *What's New in Residential Real Estate Brokerage Competition – An FTC-DOJ Workshop (Segment 2)*, FTC, 7 (2018), https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-2/ftc- doj_residential_re_brokerage_competition_workshop_transcript_segment_2.pdf.

[28] Muller, *supra* note 44, n.100 (emphasis added). *See also* Barwick, Pathak & Wong, *supra* note 33, at 1 ("In the conventional compensation arrangement where sellers pay for the commissions of their listing agents and potential buyers' agents, the latter have an incentive to prioritize properties that offer higher commissions. This kind of steering is thought to lead to uniformly high commissions.").

[29] David McLaughlin & Patrick Clark, *U.S. Opens Antitrust Probe of Real Estate Brokerage Industry*, BLOOMBERG

The Antitrust Division served Civil Investigative Demands ("CIDs") pursuant to its investigation into "[p]ractices that may unreasonably restrain competition in the provision of residential real-estate brokerage services."[30]

81.     The Antitrust Division entered into and subsequently withdrew from a proposed consent decree that would have resolved some but not all of the rules at issue here (e.g.,  NAR rules encouraging buyer-brokers to represent their services as free to buyers, allowing MLS participants to filter listings based on the amount of the blanket compensation offer, and prohibiting disclosure of the blanket offer to buyers in listings). DOJ indicated that the reason behind its withdrawal was so it could "investigate and challenge additional potential antitrust violations committed by Defendant [NAR]."[31] DOJ successfully appealed a district court's ruling that its withdrawn settlement agreement barred DOJ from continuing its investigation into certain potential anticompetitive practices by NAR.

82.     The Buyer Broker Commission Rule's facilitation of steering was also magnified by the Rule's requirement that the compensation that home sellers offer to buyer-brokers on MLSs *had* to be offered as a percentage of the gross selling price or a definite dollar amount and by the Rule's prohibition on "general invitations by listing [i.e., seller] brokers to other participants to discuss terms and conditions of possible cooperative relationships." By requiring that offers of compensation be expressed in specific dollar or percentage terms, the Rule ensured that buyer-brokers could easily compare the financial compensation offered to them by home sellers and steer buyers away from properties offering materially less than the "standard real estate commission."[32]

---

(May 22, 2019), https://www.bloomberg.com/news/articles/2019-05-22/u-s-opens-antitrust-probe-of-real-  estate-brokerage-industry.

[30] Civil Investigative Demand to CoreLogic, U.S. Dep. of Just., No. 29938 (dated May 16, 2019).

[31] *See* Notice of Withdrawal of Consent to Entry of Proposed Final Judgment, July 1, 2021, in *U.S. v. National Association of REALTORS®* at 1-2.

[32] Lawrence White, from the Stern School of Business at New York University, has explained that "a fixed percentage

83. By encouraging and facilitating steering, and adherence to the "standard real estate commission," the Buyer Broker Commission Rule deterred downward departures from the standard commission and enabled brokers to avoid doing business with or otherwise retaliate against buyer-brokers who try to compete by offering significant discounts.

84. The purpose and anticompetitive effects of the Buyer Broker Commission Rule were reinforced by the fact that until recently neither the buyer nor the seller was even permitted to view the universe of buyer-broker commission terms and thus had limited means to detect whether the buyer-broker was engaged in steering to higher commission properties. The MLSs utilized hidden fields that only *realtors* (i.e., brokers) subscribed to the MLS could see. Two types of these hidden fields addressed compensation to buyer-brokers. The first field type consisted of the unilateral offer of buyer-broker commission that had to be supplied as a condition of listing a home on the MLS. The second field type was called "private remarks," and listing brokers often included additional financial incentives for buyer-brokers in the "private remarks" field. For example, one "private remark" offered buyer-brokers a vacation in Mexico if the buyer-broker purchased three homes from the listing broker.

85. Until recently, sellers and buyers (and the general public) were precluded from accessing the hidden fields and seeing the universe of buyer-broker commissions and other financial incentives being offered on the MLS.

86. NAR also instituted a series of rules that ensured that commission offers and private remarks were not disclosed through data sharing agreements with third-party websites or other

---

fee announced by most or all brokers in a metropolitan area prevents the inherent quality differences that surely exist among brokers from being rewarded. It has frequently been noted that sellers that are attempting to coordinate their pricing behavior at above-competitive levels will usually favor simple pricing schedules over more complex ones, even if this simplicity means that quality differences go unrewarded." Laurence J. White, *The Residential Real Estate Brokerage Industry: What Would More Vigorous Competition Look Like*, Stern School of Business, 8 (2006) (Revised Draft).

MLS syndication services.

87.     Simultaneously, the NAR rules *mandated* price information sharing among brokers through its MLS rules. This type of one-way information exchange agreement prevented price competition that benefitted consumers while allowing brokers to put upward pressure on pricing and to punish brokers who deviated downwards. Moreover, until recently, home sellers and homebuyers, unlike brokers, did *not* have access to the universe of "blanket unilateral offers of compensation" being made to buyer-brokers, significantly impeding their ability to detect steering by buyer-brokers. As one commentator explained, "Buyers are never aware they are being steered. The buyer agent makes a selection of homes to show, and since the public sources of homes never shows the commission offered, buyers are never aware when their agents select out the homes with lower priced commission offerings."[33]

88.     This obfuscation is compounded by the fact that until 2022, NAR's ethical rule expressly permitted buyer-brokers to tell buyers that their services were free. NAR's Code of Ethics Standard 12-2 stated that "REALTORS may represent their services as 'free' or without cost if they expect to receive compensation from a source other than their client provided that the potential for the REALTOR to obtain a benefit from a third party is clearly disclosed at the same time."

89.     By disingenuously marketing their services as free, buyer-brokers were able to discourage home buyers from (1) engaging in any negotiations over buyer-broker commissions and (2) searching for alternative buyer-brokers who might offer discounts or rebates from the

---

[33] Magura, *supra* note 45 at n.21. *See also* Peng Liu & Richard Weidel III, *Compensation Structure of Buyer Brokers and Residential Real Estate Transactions*, 7 CORNELL REAL ESTATE REV. 74, 79 (2009) ("The ability to `steer' clients is aided by the practice of never publicly showing the commission rate offered. Only licensed real estate agents have access to the commission rate information, such that a consumer would never know that a broker screened listings based on commission rates.").

commissions they receive.

90.     The  anticompetitive restraints have had their intended effect of diminishing price competition and stabilizing and fixing the buyer-broker charges imposed on home sellers at or near the "standard real state commission" level and—because the actual dollar charge is calculated as a percentage of rising home prices—*substantially elevating* the actual overcharge.

91.     Although NAR has widely claimed that real estate commissions are "negotiable," this claim disregards the adverse market impact of the conspiracy's anticompetitive restraints that impeded effective negotiation. For the home seller, this occurred for many reasons including, but not limited to, the following.

92.     First, the conspiracy's actions had the purpose and effect of elevating the baseline for any negotiations that could follow. Thus, just as an unlawful agreement to fix list prices (or an agreement to increase price announcement terms) is potentially subject to negotiation by some purchasers, the conspiracy's actions are anticompetitive and unlawful because they elevate the baseline for negotiations.

93.     Second, by requiring sellers to make unilateral blanket offers of buyer-broker compensation as a precondition for listing properties on MLSs, the Buyer Broker Commission Rule compelled sellers to offer high buyer-broker commissions to attract potential buyers. Sellers who attempted to negotiate down the amount of buyer-broker commission offered on an MLS were customarily informed by listing brokers that reducing that amount would result in materially fewer potential buyers learning about or viewing the property for sale.

94.     In fact, listing brokers were trained to dissuade home sellers from reducing the buyer-broker commission.

95.     Third, because NAR required the listing broker to make a financial offer to the

buyer-broker, sellers would build this cost into the total commission they charged. Because the total commission is then a term of contract between the home seller and the listing broker, NAR created a "Catch 22" and warned MLS participants that actions by the buyer-broker to reduce the total commission could constitute unlawful interference with contract. As a result, if the buyer negotiated a lower commission with a buyer-broker, the seller's agent was still permitted to charge and receive the full amount of the originally negotiated commission from the seller.

96.     Fourth, as explained above, the NAR Code of Ethics permitted buyer-brokers to tell buyers that their services were free to the homebuyer. As a result, homebuyers were effectively told they had no reason to seek a reduction in the buyer-broker commission.

97.     Fifth, NAR took additional actions to restrain such negotiations even further. NAR's ethical rules (and subsequent interpretations), until recently, expressly prohibited buyer-brokers from attempting to reduce buyer-broker commissions offered on MLSs through the submission of purchase offers. NAR's Standard of Practice 16-16 stated: "REALTORS, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation." In other words, it was an unequivocal violation of NAR's ethics rules for a buyer-broker to even present an offer to a seller that was conditional on the seller reducing the buyer-broker commission.

98.     NAR's Case Interpretations not only underscored the prohibition on purchase offers that reduce buyer-broker commissions, but also illogically instructed buyer-brokers who sought to modify buyer-broker commissions to attempt those modifications *before they even showed* the property to any potential buyers. NAR's Case Interpretation #16-15 stated: "The Hearing Panel's

decision noted that REALTOR® B was indeed entitled to negotiate with REALTOR® A concerning cooperating broker compensation *but that such negotiation should be completed prior to the showing of the property* by Realtor® B. The decision indicated that REALTOR® B was entitled to show property listed by REALTOR® A on the terms offered by the listing broker in the

MLS." (Emphasis added). By requiring buyer-brokers seeking to reduce buyer-broker commissions to request those reductions prior to even showing the property to a potential buyer, NAR foreclosed virtually all negotiation over the buyer-broker commission.[34] That requirement implausibly contemplated that a buyer-broker would unilaterally contact a selling-broker to request a reduction to the buyer-broker commission before a potential buyer had even seen, let alone expressed an interest in purchasing, the property. Furthermore, even in such highly unusual circumstances, the listing broker was permitted by NAR rules to respond to the request by reducing the buyer-broker commission but simultaneously *increasing* the listing broker's commission by the amount of the reduction, thereby boosting the potential compensation to the listing broker without altering the total commission that the seller had already contractually agreed to pay.

99.     NAR's rules also restrained negotiation of the buyer-broker commission by providing that after the seller had received purchase offers, the listing broker was prohibited from attempting to unilaterally modify the buyer-broker commission that was offered on the MLS. NAR Standard of Practice 3-2, until recently, stated: "Any change in compensation offered for cooperative services must be communicated to the other REALTOR® prior to the time that REALTOR® submits an offer to purchase/lease the property. After a REALTOR® has submitted

---

[34] Even if some negotiation did rarely occur, the Buyer Broker Compensation Rule still worked to elevate the baseline for any such rare negotiations. Just as an agreement to fix prices (or an agreement to announce uniform price increases) is *per se* unlawful even though the marketplace might reflect some potential negotiation with the conspirators' customers, the Defendants' conspiracy here is unlawful and anticompetitive because it elevated the baseline for any negotiations.

an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction." As a result, a seller could not respond to a purchase offer with a counteroffer that was conditional on reducing the buyer-broker commission. Nor could the seller, after receiving purchase offers, decide to unilaterally reduce the buyer-broker commission offered on the MLS.

100.    Until recently, NAR imposed yet another restraint on negotiation by interpreting its rules to make it unethical for a buyer-broker to urge the buyer to negotiate directly with the seller to reduce commissions. As the vast majority of homebuyers have limited or no familiarity with this market (and, as noted above, until 2022 were told that the buyer-broker's services to them were "free"), imposing such a restriction on the ability of their fiduciary to take any action encouraging such negotiation, further restrained such negotiations.

101.    When in place, the foregoing restraints caused downward negotiation of the buyer-broker commission to be extremely limited and maintained the buyer-broker commission at a supra-competitive level (and substantially increased in actual dollars charged) for many years. Indeed, listing brokers who initially list property with a buyer-broker commission at 2.5% or above almost always stay at a high commission rate (and, if a listing broker who initially offers a lower buyer-broker commission decides to change the amount, the change ordinarily involves imposition of an *increased* buyer-broker commission).

102.    In short, the Buyer Broker Commission Rule adopted, implemented and enforced by the conspiracy has achieved exactly what it was designed to do: it has imposed significant overcharges on home sellers, it has maintained (and even increased) those overcharges over time notwithstanding technology changes that should have substantially reduced commissions, and it has significantly impeded the ability of lower-cost alternatives to create a more competitive

marketplace.

## VII. NAR HAS REQUIRED LOCAL ASSOCIATIONS TO AGREE TO THESE ANTICOMPETITIVE RESTRAINTS

103.    Until recently, NAR successfully required its affiliates, including state and local realtor associations, as well as non-member brokers and individual realtors operating in areas with MLSs owned and/or operated by local realtor associations, to fully comply with the above anticompetitive rules contained in the NAR Handbook on Multiple Listing Policy and the NAR Code of Ethics.

104.    NAR requires its affiliates that own and/or operate an MLS to comply with the mandatory provisions in NAR's Handbook on Multiple Listing Policy and with NAR's Code of Ethics. The Handbook states that an agreement by an association for the establishment of an MLS must include "roles and responsibilities of each association for enforcement of the Code of Ethics" and the "intent of the multiple listing service(s) to operate in compliance with the multiple listing policies of the National Association."

105.    Local realtor associations are required by NAR to monitor their MLS and the MLS's participants adhere to the mandatory provisions in NAR's Handbook on Multiple Listing Policy. Thus, each local realtor association and MLS agreed to the anticompetitive restraints challenged herein, and played a central role in implementation and enforcement of those restraints.

106.    Because access to the MLSs is a commercial necessity for brokers and individual realtors, all brokers and individual realtors located throughout most of the United States must comply with the mandatory provisions in NAR's Handbook, which until recently included the Buyer Broker Commission Rule. Without access to a local MLS, a broker or agent would be unable to list properties for sale in the centralized database or receive offers of compensation for finding a buyer for a listed property.

33

107. NAR has established and disseminated model rules for local realtor associations, and for the MLSs that these local associations own and/or operate, and those model rules require adherence to both NAR's Code of Ethics and the Handbook on Multiple Listing Policy.

108. One of the many benefits NAR provides to its realtor associations and the MLSs owned by those associations is professional liability insurance. To be eligible for this insurance, realtor associations and their MLSs must comply with the mandatory provisions in the Handbook on Multiple Listing Policy.

109. NAR reviews the governing documents of its local realtor associations to ensure compliance with its rules. NAR requires its local realtor associations to demonstrate their compliance with these rules by periodically sending their governing documents to NAR for review.

110. A handful of MLSs—fewer than 5%—are not exclusively owned or operated by NAR associations.[35] These MLSs are nevertheless typically controlled by REALTOR® associations and/or NAR-aligned brokerages and are not fully independent from NAR. In addition, these MLSs and their participating brokerages are generally subject to the same or similar anticompetitive restraints that apply in MLSs that are under NAR's formal control, including because: (i) all realtor members of non-NAR MLSs are subject to NAR's Code of Ethics; and (ii) each non-NAR MLS has adopted the same or similar anticompetitive restraints as those imposed by NAR on its affiliated MLSs. These non-NAR MLSs include but are not limited to the following:

- **Midwest Real Estate Data**. Midwest Real Estate Data is located in Illinois. It is partly owned by REALTOR® associations and partly owned by brokerages. Midwest Real Estate

---

[35] *See, e.g.*, T3 Sixty, LLC, Real Estate Almanac 126 (2020), RMLLC-NDIL-01415597 at 5718 ("Of the 565 MLSs in the County, 107 are regional MLSs, either owned by two or more REALTOR® associations or serve regional markets (19 are broker-owned); 458 are local MLSs, which have a single REALTOR® association owner. Just 3 percent of MLSs are not owned by a REALTOR® association or group of associations").

Data limits its membership to REALTORS® and has adopted rules mandating blanket unilateral offers of compensation.

- **Garden State MLS**. Garden State MLS is located in New Jersey. Although Garden State MLS permits both REALTORS® and non-REALTORS® to join it has required non-REALTOR® members to agree to abide by NAR's Code of Ethics. Garden State MLS has also adopted rules mandating blanket unilateral offers of compensation.

- **Metrolist MLS**. Metrolist MLS is located in California. It is part REALTOR® association owned and part broker owned. Metrolist MLS adopted rules mandating blanket unilateral offers of compensation. Metrolist MLS further restricted the display and publication of cooperative commissions through electronic and other means, and adopted a rule comparable to NAR Standard of Practice 16-16.

- **Real Estate Information Network**. Real Estate Information Network is located in Virginia. Real Estate Information Network adopted rules mandating blanket unilateral offers of compensation. Real Estate Information Network also adopted rules making commission fields confidential and generally prohibiting their disclosure to customers and clients.

- **West Penn Multi-List ("WPML")**. West Penn Multi-List is located in Pennsylvania. Since at least 2013, West Penn Multi-List rules mandated unilateral, blanket, fixed offers of compensation set by the seller and listing broker in MLS property listings, though the West Penn Multi-List rules slightly lowered the minimum offer from $1 or 1 cent to $0. In addition, West Penn Multi-List rules prohibited the disclosure of buyer-broker compensation on IDX commission fields through IDXs. West Penn Multi-List also

incorporated NAR's Code of Ethics into its MLS rules and thus mandated that all its brokers abide by the NAR Code of Ethics, whether or not they are REALTORS®.

- **MiRealSource**. MiRealSource is located in Michigan. MiRealSource adopted rules mandating blanket unilateral offers of compensation. It also prohibited the display of "cooperative compensation" fields on its IDX feeds.

- **SmartMLS**. SmartMLS is located in Connecticut. It is partly REALTOR® association owned and partly REALTOR® broker owned. SmartMLS limits participation to REALTORS®. SmartMLS has expressly modelled its MLS policies after those adopted by NAR, and adopted rules mandating blanket unilateral offers of compensation. SmartMLS also has excluded "cooperative compensation" fields from its IDX and VOW data feeds.

- **Bay Area Real Estate Information Service ("BAREIS")**. BAREIS MLS is located in California. It is partly REALTOR® association owned and partly broker owned. BAREIS rules mandated unilateral, blanket, fixed offers of compensation set by the seller and listing broker in MLS property listings, though by March 31, 2020, BAREIS had lowered the minimum required offer to $0. BAREIS has also had rules that restrained listing brokers or buyer-brokers from negotiating changes from the unilateral blanked fixed offers of compensation made in the listings.

- **Hudson County MLS/Realty MLS ("RMLS")**. RMLS is located in New Jersey. RMLS adopted rules mandating blanket unilateral offers of compensation. RMLS further adopted rules prohibiting the display of commission information, while also expressly permitting the filtering of listings by offered commissions.

- **The Residential Listing Service ("RLS") of the Real Estate Board of New York ("REBNY").** The RLS offers an MLS-like service in New York City—primarily in

Manhattan. Until recently, the RLS rules created a default rule that the compensation offered to buyer-brokers would be equal to 50% of the total compensation received by the listing broker. Moreover, the RLS rules required that any change in the original listing had to be entered into RLS, thus requiring that any change had to apply to all buyer-brokers and thus maintaining a requirement of blanket offers. RLS rules also restrained negotiation of offered buyer-broker commissions by providing, "Any negotiation of the reduction of a brokerage commission must be done with both the Exclusive Broker and the Co-Broker's approval of the commission reduction."

- **Mid-Hudson MLS ("MHMLS")**. MHMLS is located in New York State. MHMLS has adopted rules mandating offers of compensation.

- **Consolidated MLS (Columbia MLS) ("CMLS")**. CMLS is located in South Carolina. CMLS adopted rules mandating blanket offers of compensation.

- **Willamette Valley MLS ("WVMLS")**. WVMLS is located in Oregon. WVMLS adopted rules mandating blanket unilateral offers of compensation. WVMLS also prohibited the display of buyer-broker commission fields, and adopted the substance of NAR Standard of Practice 16-16.

- **Upstate New York REIS ("UNYREIS")**. UNYREIS is located in New York State. It is REALTOR® broker owned, and partly managed by a local REALTOR® association. UNYREIS limits its membership to REALTORS®. UNYREIS adopted NAR's MLS rules largely in their entirety, including NAR rules mandating blanket unilateral offers of compensation. It also included rules prohibiting the disclosure of cooperative commissions. UNYREIS has required that all of its members adhere to NAR's Code of Ethics.

- **Western New York REIS ("WNYREIS")**. WNYREIS is located in New York State. It is REALTOR® broker owned, and managed by a local REALTOR® association. WNYREIS limits its membership to REALTORS®. WNYREIS adopted NAR's MLS rules largely in their entirety, including NAR rules mandating blanket unilateral offers of compensation. It also included rules prohibiting the disclosure of cooperative commissions. WNYREIS requires that all of its members adhere to NAR's Code of Ethics.

111.    Further, Defendant non-NAR MLSs CNYIS and Brooklyn MLS participated in the conspiracy through implementing and enforcing similar anticompetitive restraints to NAR's Rule. CNYIS is REALTOR® broker owned and managed by a local REALTOR® association. CNYIS limits its membership to REALTORS®. CNYIS has largely adopted NAR's MLS rules in their entirety, including NAR rules mandating blanket unilateral offers of compensation. It also included rules prohibiting the disclosure of cooperative commissions. CNYIS requires that all of its members adhere to NAR's Code of Ethics.

112.    While Brooklyn MLS has not adopted the Buyer Broker Commission Rule, in practice, it required listings to offer compensation to agents working with buyers. It also previously adopted the NAR Code of Ethics provision encouraging agents working with buyers to represent that their services were free.

## VIII. CORPORATE DEFENDANTS PARTICIPATE IN, FACILITATE, AND IMPLEMENT THE CONSPIRACY

113.    The Corporate Defendants have agreed to adopt, follow, promote, implement, and enforce the Buyer Broker Commission Rule through their involvement in NAR and imposition of NAR rules on local real estate associations and the Corporate Defendants' brokers and employees. By participating in an association that prevents member institutions from allowing their associates to compete with each other for commissions—and agreeing to follow and enforce its

anticompetitive rules—the Corporate Defendants have joined the conspiracy and have played a central role in its implementation and enforcement.

114.    The Corporate Defendants participate in, follow, implement, facilitate and enforce the conspiracy in at least three ways: (1) Defendants and their franchisees assist in NAR's enforcement of the rules; (2) Defendants require their brokers, agents, and franchisees (and the agents or realtors employed by those franchisees) to comply with NAR rules, including the Buyer Broker Commission Rule; and (3) Defendants and their affiliated brokerages, through their participation in MLSs and their officers' and employees' membership in NAR, agree to adhere to anticompetitive restraints, including those reflected in MLS rules and NAR's Code of Ethics.

115.    Representatives from the Corporate Defendants hold leadership positions in NAR. For example, a principal broker of Washington Fine Properties states he is actively involved in NAR.

116.    A Seven Gables' branch manager served on the Board of Directors of NAR.

117.    A Signature Premier Properties branch manager served on the Board of Directors of NAR.

118.    First Team's Chief Executive Officer serves as NAR's Federal Political Coordinator.

119.    By virtue of their leadership positions in NAR, these and other representatives from the Corporate Defendants had responsibility for formulating, reviewing, and approving rules like the Buyer Broker Commission Rule. NAR approves and issues a new MLS Handbook each year. The NAR Board of Directors has final approval on additions and amendments to MLS rules and regulations. Until recently, the Board had consistently and repeatedly reissued the Buyer Broker Commission Rule and anticompetitive restraints challenged herein.

120. Each Corporate Defendant assists NAR with ensuring compliance with the NAR rules. Local realtor associations and the NAR Board of Directors are responsible for the enforcement of NAR's MLS rules and regulations. As noted above, representatives from Corporate Defendants are actively involved in NAR and serve on its Board of Directors, which considers all written complaints involving alleged violations of NAR's rules and regulations. Representatives from the Corporate Defendants also serve the boards of local realtor organizations.

121. For example, Seven Gables' real estate advisors have served on the Board of Directors of the Pacific West Association of REALTORS® and California Association of REALTORS®.

122. Similarly, Washington Fine Properties' principal broker is actively involved in the Greater Capital Area Association of REALTORS®.

123. Side's managing brokers have served on the Board of Directors of Virginia REALTORS®, Houston Association of REALTORS®, and Seattle King County REALTORS®.

124. Signature Premier Properties' branch managers have served on the Board of Directors of the Long Island Board of REALTORS®. One of its branch managers was a longstanding member of the Long Island Board of REALTORS®'s Professional Standards Committee, which enforces and handles violations of NAR's Code of Ethics.

125. Your Castle Realty's Founder and Chairman has served on the Board of Directors for the Denver Board of REALTORS®.

126. First Team's Chief Executive Officer serves on the Board of Directors for the California Association of REALTORS®.

127. Finally, Corporate Defendants have also agreed to participate in, follow, implement, facilitate and enforce the conspiracy by imposing NAR's rules, including the Buyer

Broker Commission Rule, on its franchisees, affiliates, and realtors. Corporate Defendants mandated or encouraged their franchisees, affiliates and realtors to join NAR and follow NAR's Code of Ethics, and join a local realtor association and/or MLS, which required compliance with the Buyer Broker Commission Rule and the other anticompetitive NAR Standards of Practice. Corporate Defendants require their realtors and franchisees to abide by NAR rules as a condition of doing business with the Corporate Defendants, and to secure the benefits of the Corporate Defendants' brands, infrastructure, and other resources that support their brokerage operations.

128. Washington Fine Properties describes their real estate agents as: "They are members of the National Association of Realtors® (NAR) and must abide by a Code of Ethics and Standards of Practice enforced by the NAR."[36]

129. Your Castle Realty similarly describes its real estate agents as: "Realtors not only meet state requirements for licensing but also adhere to a strict Code of Ethics through their membership in the National Association of Realtors. Your Castle Real Estate agents bring unparalleled expertise in the Denver market and access to the MLS (Multiple Listing Service) to help you find the perfect home."[37]

130. First Team's training information for individuals looking to become Realtors indicates that the process of becoming a Realtor includes "Association of Realtors and local MLS Fees".[38] First Team's CEO has stated that "Brokers are basically forced to be members of NAR (MLs and forms). [ . . . ] They make the rules on cooperating commissions, and we follow them."[39]

131. JPAR Real Estate's franchisor, JPAR Franchising, LLC, requires "[a]ll principals

---

[36] https://www.wfp.com/find-an-agent.
[37] https://www.yourcastle.com/resources/buyers-guide.
[38] https://www.firstteam.com/careers/training/.
[39] Claudia Larsen, *Real Estate Reacts! NAR Settlement Views from Agents, Brokers and CEOs – Part 1*, RISMedia (Mar. 22, 2024), https://www.rismedia.com/2024/03/22/real-estate-reacts-nar-settlement-views-from-agents-brokers-ceos-part-1/.

and Agents of [its] Franchisee must adhere to the Code of Ethics of the National Association of Realtors."[40] It also requires its franchisees "to arrange . . . for Franchisor or its designee to receive one or more direct electronic feed of all real estate listings, including all supporting content, from the multiple listing service(s) used by Franchisee . . . in compliance with the then-effective and current Virtual Office Website (VOW) and/or Internet Data Exchange (IDX) standards adopted by the National Association of Realtors."[41]

132.    Thus, by enforcing the rule through NAR and local realtor association leadership, and requiring franchisees, realtors, and other affiliates to join NAR, local realtor associations and MLSs, and comply with their rules, each Corporate Defendant has agreed to participate in, follow, implement, facilitate, and enforce the conspiracy.

## IX.    EFFECTS OF THE CONSPIRACY

133.    Defendants' conspiracy has had the following anticompetitive effects nationwide:

- Home sellers have been forced to pay commissions to buyer-brokers—their adversaries in negotiations to sell their homes— thereby substantially inflating the cost of selling their homes.

- Home sellers have been compelled to set a high buyer-broker commission to induce buyer-brokers to show their homes to home buyers.

- Home sellers have paid inflated buyer-broker commissions and inflated total commissions.

- The retention of a buyer-broker has been severed from the setting of the broker's commission; the home buyer retains the buyer-broker, while the home seller sets the buyer-broker's compensation.

---

[40] https://www.franchimp.com/?page=pdf&f=123591_2023.pdf at pp. 120, 124.
[41] *Id.* at p. 122.

- Price competition among brokers to be retained by home buyers has been restrained.

- Competition among home buyers has been restrained by their inability to compete for the purchase of a home by lowering the buyer-broker commission.

- Corporate Defendants have increased their profits substantially by receiving inflated buyer-broker commissions and inflated total commissions.

134. There are no pro-competitive effects of Defendants' conspiracy. Indeed, none of the purposes of the MLS "has anything to do with interbroker compensation. In fact, MLSs could continue providing every service of significance they provide without addressing compensation at all."[42] No purported pro-competitive benefit explains why, until recently, the Buyer Broker Commission Rule was mandatory. Moreover, even if there were any plausible pro-competitive effects, they would be substantially outweighed by the conspiracy's anticompetitive effects.

135. There is substantial economic evidence that Defendants' conspiracy has resulted in buyer-broker commissions and total commissions paid by home sellers that are inflated well above a competitive level nationwide.

136. Compared to other similar countries with competitive markets for residential real estate brokerage services, the commissions in the United States are substantially higher. In a 2002 study titled "International Residential Real Estate Brokerage Fees and Implications for the US," economists Natalya Delcoure and Norm Miller compared real estate commissions around the

---

[42]Brian N. Larson, *The End of MLS as We Know It, Redux*, LARSON SKINNER (2010), http://larsonskinner.com/2010/12/15/the-end-of-mls-as-we-know-it-redux-part-i/. *See also* B. Kaufman, *Why the Class Action Lawsuit Against NAR and the Big Brokers Makes Sense* (June 3, 2019), https://www.inman.com/2019/06/03/why-the-class-action- lawsuit-against-nar -and-the-big-brokers-makes sense/ (explaining that the idea that if buyers pay their agent's commission "this could be the end of the MLS does not make sense. The MLS's value is giving buyers and sellers a centralized place to go for listings. Its value is not in artificially keeping buyer's agents' commissions high.  So, changing the way buyer's agents are paid does not reduce the value of the MLS at all.").

world with those in the United States. They concluded: "Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand. . . . In the UK, the [total] commission rates average less than 2%. . . . In New Zealand and South Africa, [total] commission rates average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%." Ultimately, the economists concluded that, "based on global data, the [total] US residential brokerage fees should run closer to 3.0%."[43]  A 2021 update to the original study found that the dynamic had not changed: commission rates in the United States remained stubbornly, even while they had fallen in much of the rest of the world including due to the proliferation of technology making real estate transactions more efficient.  Professor Miller noted "Brokerage firms engaged in residential sales in the U.S., for the most part, resist competing openly on price, especially buyer's agents," concluding that "[t]his agent interdependency and resistance to competing on price would likely break down if buyers and sellers paid fees directly, and without revealing the fees in a Multiple Listing System."[44]

137.    In comparison, the total broker commissions (*i.e.*, the aggregate commission paid to the listing broker and buyer broker) in most areas of the United States average between 5% and 6%, with buyer broker commissions by themselves holding steady in a range between 2.5% and 3%. Due to the conspiracy, these numbers remained stable despite both rising home prices (which leads to larger commission amounts) and the decreasing role of the buyer broker in an age when many prospective home buyers have already scoured the market using Zillow or other websites.

---

[43] Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry*, 5 INT'L REAL ESTATE REV. 12, 13-14, 17 (2002), https://www.um.edu.mo/fba/irer/papers/past/vol5_pdf/012_039US.pdf.

[44] Norman G. Miller, *Revisiting Residential Brokerage Fees in a More Technologically Advanced World*, 45 REAL ESTATE ISSUES 1 (Jan. 25, 2021), https://cre.org/wp-content/uploads/2021/01/Real-Estate-Issues-Revisiting-Residential-Brokerage-Fees-in-a-More-Technologically-Advanced-World.pdf.

138.     As explained above, the stability of the commission rate significantly understates the actual charges that have been imposed on home sellers. The actual dollar commission is determined by applying the rate to the sale price of a home. Since 2000, home prices have approximately doubled, while the total rate of inflation has been below 50%.

139.     Moreover, while "competitive pressures in an industry ordinarily force competitors to adopt fee structures that reflect their costs, this has not occurred for real estate broker fees." Instead, "broker fees are usually set without regard to either the quantity or quality of service rendered."[45]

140.     The stability and maintenance of high broker commissions (and the substantial increase in actual dollar charges for their services) stands in stark contrast to the experience in other industries since the advent of the Internet. "One would have expected that an information and communication-based industry like real estate brokerage, would enjoy tremendous cost efficiencies from the development of the Internet, Databases, and other communication technologies. Yet it appears that traditional brokers generally have not passed on their cost savings to consumers in the form of lower fees."[46]

141.     The adverse economic impact of the conspiracy's restraints on price competition have been severe. The Consumer Federation of America, which has reviewed and criticized the brokerage industry's practices for many years, has indicated that "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform 5-6% commissions would quickly disappear."[47]

142.     Brian Larson, an attorney who represented many MLSs and was previously an MLS

---

[45] Nadel, *supra* note 15, at 4.
[46] Nadel, *supra* note 15, at 7.
[47] Brobeck & Woodall, *supra* note 28, at 4.

executive, has observed that "[w]ith the demise of subagency, there is little reason to keep interbroker compensation." According to Larson, "[g]etting rid of interbroker compensation" [i.e., payments from listing brokers to buyer-brokers] would improve the market in several areas, including:

- Buyer-broker fees can be commensurate with the skill and experience of the broker and with the buyer's needs."

- "The market benefits from price competition for buyer broker services."

- "The dangers of price fixing, and the claims by industry watchdogs that it exists now, will largely be addressed. Brokers will really be unable to tell what their competitors are charging for services, and there will be no incentive for commissions to be 'standard.'"[48]

143. Because of the scope and magnitude of the overcharges at issue here, the economic cost to the plaintiff class and other consumers is enormous. Estimates of the amount of "annual broker fees consumers might save if there was effective price competition suggests as much as $30 billion or more annually."[49] Economists Hsieh and Moretti have suggested that "more than half of current commissions might be eliminated by competition."[50] Natalya Delcoure and Norm Miller "found that U.S. broker fees should equal something closer to three percent."[51]

---

[48] Larson, *supra* note 83 (Larson has written about the "Danger of price fixing" and explained that because of the publication of buyer-broker compensation on an MLS, "a few market-leading brokers can establish the market-rate cooperating compensation [i.e., buyer-broker commission] without ever speaking directly to each other. They can just watch what happens on MLS. Thanks to the MLS offer of compensation, listing brokers effectively are able to fix service prices of buyers' brokers; many buyers' brokers are loathe to collect more than what is offered in MLS, even if the broker has a written agreement with the buyer providing for a higher payment." Although Larson recognizes that the system facilitates price-fixing, the reality—as described above—has been that it has stabilized commission levels at the "industry standard" (and elevated actual dollar commissions substantially), notwithstanding declining costs).

[49] Nadel, *supra* note 15, at 8.

[50] *Id.* at 8 n.28 (citing C. Hsieh & E. Moretti, Can Free Entry be Inefficient? Fixed Commissions and Social Waste in the Real Estate Industry, 111 J. POL. ECON. 1076 (2003)).

[51] *Id.* at 9 n.28. *See also The Realtor Racket, supra* note 12 (explaining that "in almost every other consumer industry

## X.     MARKET POWER

144.     A relevant service market for the claims asserted herein is the bundle of services provided to homebuyers and sellers by residential real estate brokers with MLS access. Defendants' control of the MLSs gave Defendants the ability to impose the Buyer Broker Commission Rule and other anticompetitive rules on class members and other market participants. Access to the MLSs is critical for brokers to compete and to assist home buyers and sellers in the areas in which those MLSs operate.

145.     A relevant geographic market for the claims asserted herein is the United States. Nearly all homes sold in the United States were listed on MLSs by brokers that are subject to the NAR MLS rules and ethics standards, as well as similar rules adopted by the few non-NAR MLSs, including Defendant MLSs CNYIS and Brooklyn MLS. Another set of relevant geographic markets are local and regional markets that are no larger than the area served by an MLS. Until recently, all brokers in each MLS had the ability to view all other listings made on that MLS and to offer and accept blanket cooperative compensation offers within that MLS, and were subject to the rules imposed by that MLS, including those challenged here.

146.     Corporate Defendants, through their co-conspirator franchisees and other conspiring brokers in the areas in which the MLSs operate, collectively provide the vast majority of the residential real estate broker services in these areas. As DOJ concluded in 2020: "The membership of an MLS is generally comprised of nearly all residential real estate brokers and their

---

. . . the introduction of Internet and discount sellers has been a phenomenal financial benefit to customers. Discount airlines have cut airfares by 60% or more, to the economic benefit of everyone with the exception of the incumbent competitors. Economists call this process of squeezing out transaction costs `disintermediation.' If any industry is ripe for this, it is the $70 billion-a-year real estate brokerage market."); B. Kaufman, *Why the Class Action Lawsuit Against NAR and the Big Brokers Makes Sense* (June 3, 2019), https://www.inman.com/2019/06/03/why- the-class-action-lawsuit-against-nar -and-the-big-brokers-makes sense/ (explaining that if buyers paid their agent's commission this "would immediately generate" discounted options).

affiliated agents in an MLS's service area."[52] Indeed, from 2015-2022 86-92% of sellers listed their homes on an MLS.

147.    Defendants and their co-conspirators collectively have market power in each relevant market through their membership in and control of the local MLS and their dominant share of the local market.

148.    Any buyer-brokers in the areas in which the MLSs operate who wished to compete outside of the Corporate Defendants' conspiracy would face insurmountable barriers. Corporate Defendants' effective control of the MLSs through their co-conspirators (*i.e.*, NAR, through their local franchisees, other local brokers, and the local realtor associations) means that non-conspiring brokers would need to establish an alternative listing service to compete with the conspiring brokers, or alternatively, attempt to compete without access to a listing service. A listing broker who represented a seller without using a listing service would lose access to the large majority of potential buyers, and a buyer-broker who represented a buyer without using a listing service would lose access to the large majority of sellers. Brokers cannot compete effectively without access to a listing service.

149.    For an alternative listing service to compete effectively with an MLS, the alternative would need to have listings as comprehensive (or at least nearly so) as an MLS. Brokers and their individual realtors who currently profit from inflated buyer-broker commissions and total commissions have minimal incentive to participate on an alternative listing service that would generate lower buyer-broker commissions and lower total commissions. Accordingly, listing brokers on an alternative listing service would struggle to attract buyer-brokers and their buyer clients. Moreover, many home sellers would not retain brokers using a new, unfamiliar alternative

---

[52] *See* Competitive Impact Statement, *U.S. v. National Association of REALTORS®,* Dec. 10, 2020, at p.4, available at: https://www.justice.gov/atr/case-document/file/1344346/download.

listing service that had no track record of success and had failed to attract sufficient buyers and buyer-brokers. Accordingly, any listing service attempting to compete with an MLS would likely fail to attract enough property listings to operate profitably and be a competitive constraint on the incumbent MLS. The absence of listing services that compete with the MLSs reflects the very substantial barriers to entry.

## XI. CONTINUOUS ACCRUAL

150. During the four years preceding the filing of this Complaint, the Corporate Defendants, through their co-conspirator brokers in the areas in which the MLSs operate, repeatedly charged and received cooperating broker commissions and total commissions that were inflated as a result of the conspiracy. These inflated commissions during the preceding four years were paid by Plaintiffs and the other class members in connection with the sale of residential real estate. Each payment of these inflated commissions by Plaintiffs and the other class members during the last four years injured them and gave rise to a new cause of action for that injury.

151. During the last four years, Defendants and their co-conspirators have followed, maintained, implemented, and enforced the Buyer Broker Commission Rule and other anticompetitive NAR rules nationwide.

## XII. CLASS ACTION ALLEGATIONS

152. Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and the following class:

> All persons who sold a home that was listed on an MLS anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home between October 31, 2019 and the present

With respect to the Defendant MLSs (CNYIS and Brooklyn MLS), Plaintiffs bring this action on behalf of themselves and the following class:

> All persons who sold a home that was listed on an MLS anywhere in the

United States where a commission was paid to any brokerage in connection with the sale of the home during the following date ranges:

All persons who sold a home that was listed on any of the following MLSs in *Moehrl v. NAR* (or their predecessors or successors): Bright MLS, Triangle MLS, Stellar MLS, Miami MLS, Florida Gulf Coast MLS, Metro MLS, Canopy MLS, Yes MLS/MLS Now, Columbus Realtors MLS, Northstar MLS, Wasatch Front MLS/Utah Real Estate, REcolorado/Metrolist, Pikes Peak MLS, GLVAR MLS, SABOR MLS, ACTRIS/ABOR MLS, HAR MLS, NTREIS, ARMLS, and Realcomp II, between March 6, 2015 and the present;

All persons who sold a home that was listed on any of the following MLSs in *Burnett v. NAR* (or their predecessors or successors): Heartland MLS, Columbia Board of Realtors, Mid America Regional Information System, or the Southern Missouri Regional MLS, between April 29, 2014 and the present;

All persons who sold a home on MLS PIN between December 17, 2016;

All persons who sold a home in Arkansas, Kentucky, and Missouri, but not on the *Moehrl* MLSs, the *Burnett* MLSs, or MLS PIN, between October 31, 2018 and the present;

All persons who sold a home in Alabama, Georgia, Indiana, Maine, Michigan, Minnesota, New Jersey, Pennsylvania, Tennessee, Vermont, Wisconsin, and Wyoming, but not on the *Moehrl* MLSs, the *Burnett* MLSs, or MLS PIN, between October 31, 2017 and the present;

All persons who sold a home on an MLS (with the exception of the *Moehrl* MLSs, the *Burnett* MLSs, and MLS PIN) anywhere in the United States (with the exception of Alabama, Arkansas, Georgia, Indiana, Kentucky, Maine, Michigan, Minnesota, Missouri, New Jersey, Pennsylvania, Tennessee, Vermont, Wisconsin, and Wyoming) between October 31, 2019 and the present.

153.    Excluded from the Class are Defendants and their officers and directors, the judicial officers presiding over this action and the members of their immediate families and judicial staff, and Plaintiffs' counsel and employees of their law firms.

154.    The Class is readily ascertainable because records of the relevant transactions should exist.

155.    Class members are so numerous that individual joinder of all its members is

impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the Class has many thousands of members, the exact number and their identities being known to Defendants and their coconspirators.

156. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class.

157. There are questions of law and fact common to the members of the Class, including, but not limited to, the following:

- Whether Defendants conspired as alleged herein;

- Whether the conspiracy harmed competition as alleged herein;

- Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits;

- Whether buyer-broker commissions and total commissions were inflated as a result of the conspiracy; and

- The appropriate class-wide measures of damages.

158. Plaintiffs have retained counsel competent and experienced in the prosecution of antitrust class action litigation to represent themselves and the Class.

159. Questions of law or fact that are common to the members of the Class predominate over any questions affecting only individual members of the Class.

160. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the court and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and

would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the vast majority of the members of the Class to seek redress for the violations of law alleged herein.

## XIII.   CLAIM FOR RELIEF

### Violation of Section 1 of the Sherman Act, 15 U.S.C § 1

161.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

162.    Beginning more than four years before the filing of this Complaint, and continuing into the present, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

163.    The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants and their co-conspirators to require home sellers to pay cooperating brokers and to pay an inflated amount.

164.    In furtherance of the contract, combination, or conspiracy, Defendants and their co-conspirators have committed one or more of the following overt acts:

a)    Participated in the establishment, implementation and enforcement of the Buyer Broker Commission Rule and/or other anticompetitive rules;

b)    Participated in the establishment, implementation and enforcement of rules by local NAR associations and MLSs that implemented the Buyer Broker Commission Rule and/or other anticompetitive rules; and

c)    Included provisions in franchise agreements, policy manuals, and other corporate agreements with franchisees, affiliates and realtors of Corporate

Defendants that required the implementation of and adherence to the Buyer Broker Commission Rule and/or other anticompetitive rules.

165. Defendants' conspiracy has required sellers nationwide to pay buyer-brokers, to pay an inflated buyer-broker commission and an inflated total commission, and has restrained price competition among buyer-brokers. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

166. Defendants' conspiracy has caused buyer-broker commissions and total commissions to be inflated. Plaintiffs and the other members of the Class paid these inflated commissions during (and before) the last four years in connection with the sale of residential real estate. Absent Defendants' conspiracy, Plaintiffs and the other class members would have paid substantially lower commissions because buyers would have the incentive to set and negotiate buyer-broker prices (and buyer-broker commissions would not be at supra-competitive levels).

167. Defendants' conspiracy is a *per se* violation of Section 1 of the Sherman Act.

168. As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, Plaintiffs and the other class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

169. Defendants' conspiracy also violates section 1 of the Sherman Act under the Rule of Reason.

170. As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, Plaintiffs and the other class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

## XIV. REQUESTED RELIEF

Plaintiffs request relief as follows:

A.     That the Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B.     That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the law;

C.     That the Court award Plaintiffs and the other members of the Class damages and/or restitution in an amount to be determined at trial;

D.     That the Court award Plaintiffs pre- and post-judgment interest;

E.     That the Court award Plaintiffs their costs of suit, including reasonable attorneys' fees and expenses;

F.     That the Court award Plaintiffs and the Class a permanent injunction, under Section 16 of the Clayton Act, enjoining Defendants from continuing conduct determined to be unlawful; and

G.     That the Court award such other relief as the Court may deem just and proper.

## **JURY TRIAL DEMAND**

Plaintiffs demand a jury trial of all issues so triable.

Dated: January 27, 2025                    Respectfully submitted by:

**COHEN MILSTEIN SELLERS &**          **WILLIAMS DIRKS DAMERON LLC**
**TOLL PLLC**                               /s/ Eric L. Dirks
*/s/   Robert A. Braun*                     Eric L. Dirks               MO # 54921
Benjamin D. Brown (*pro hac vice*          1100 Main Street, Suite 2600
*forthcoming*)                              Kansas City, MO 64105
Robert A. Braun (*pro hac vice forthcoming*)   Tele: (816) 945 7110
Sabrina Merold (*pro hac vice forthcoming*)    Fax: (816) 945-7118
1100 New York Ave. NW, Fifth Floor          dirks@williamsdirks.com

Washington, DC 20005
Telephone: (202) 408-4600
bbrown@cohenmilstein.com
rbraun@cohenmilstein.com
smerold@cohenmilstein.com

Daniel Silverman (*pro hac vice forthcoming*)
769 Centre Street
Suite 207
Boston, MA 02130
Telephone: (617) 858-1990
dsilverman@cohenmilstein.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman (*pro hac vice forthcoming*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

Rio S. Pierce (*pro hac vice forthcoming*)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
riop@hbsslaw.com

Nathan Emmons (Mo. Bar. No. 70046)
Jeannie Evans (*pro hac vice forthcoming*)
455 North Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
nathane@hbsslaw.com
jeannie@hbsslaw.com

**SUSMAN GODFREY L.L.P.**
Marc M. Seltzer (*pro hac vice forthcoming*)
Steven G. Sklaver (*pro hac vice forthcoming*)
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 789-3100
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

Beatrice C. Franklin (*pro hac vice forthcoming*)

**KETCHMARK AND MCCREIGHT P.C.**
Michael Ketchmark      MO # 41018
Scott McCreight        MO # 44002
11161 Overbrook Rd. Suite 210
Leawood, Kansas 66211
Tele:   (913) 266-4500
mike@ketchmclaw.com
smccreight@ketchmclaw.com

**WILLIAMS DIRKS DAMERON LLC**
Eric L. Dirks              MO # 54921
1100 Main Street, Suite 2600
Kansas City, MO 64105
Tele: (816) 945 7110
Fax: (816) 945-7118
dirks@williamsdirks.com

**BOULWARE LAW LLC**
Brandon J.B. Boulware       MO # 54150
Jeremy M. Suhr              MO # 60075
1600 Genessee Street, Suite 956A
Kansas City, MO 64102
Tele:   (816) 492-2826
Fax:    (816) 492-2826
brandon@boulware-law.com
jeremy@boulware-law.com

One Manhattan West
New York, New York 10001
Telephone: (212) 336-8330
bfranklin@susmangodfrey.com

Matthew R. Berry (*pro hac vice forthcoming*)
Floyd G. Short (*pro hac vice forthcoming*)
Alexander W. Aiken (*pro hac vice forthcoming*)
401 Union St., Suite 3000
Seattle, Washington 98101
Telephone: (206) 516-3880
mberry@susmangodfrey.com
fshort@susmangodfrey.com
aaiken@susmangodfrey.com

*Attorneys for Plaintiffs and the Class*

**THE PETTIT LAW FIRM**
Julie Pettit (*pro hac vice forthcoming*)
jpettit@pettitfirm.com
1900 N. Pearl, Suite 1740
Dallas, Texas 75201
Telephone: (214) 329-0151
Facsimile: (214) 329-4076

**LYNN PINKER HURST & SCHWEGMANN, LLP**
Michael K. Hurst (*pro hac vice forthcoming*)
mhurst@lynnllp.com
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800
Facsimile: (214) 981-3839

**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox (*pro hac vice forthcoming*)
800 Third Avenue, 38th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
ffox@kaplanfox.com

*Additional Class Counsel*